STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 10-830


STATE OF LOUISIANA

VERSUS

ERIC JOSEPH SMITH


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 296,584
HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and Shannon J. Gremillion
Judges.

                                                                    **AFFIRMED.**




**James C. Downs**
**District Attorney - Ninth Judicial District Court**
**701 Murray Street**
**Alexandria, LA 71301**
**(318) 473-6650**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**G. Paul Marx**
**P. O. Box 82389**
**Lafayette, LA 70598-2389**
**(337) 237-2537**
**Counsel for Defendant/Appellant:**
**Eric Joseph Smith**

**EZELL, JUDGE.**

The Defendant, Eric Joseph Smith, was charged in an indictment filed on April 23, 2009, with first degree murder, in violation of La.R.S. 14:30; attempted first degree murder, in violation of La.R.S. 14:30 and 14:27; and possession of a firearm by a convicted felon, in violation of La.R.S. 14:95.1. The Defendant entered a plea of not guilty on May 8, 2009.

Jury selection commenced on January 12, 2010, and the jury found the Defendant guilty as charged on January 15, 2010. The Defendant was sentenced on January 25, 2010, to serve life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence for first degree murder; to fifty years at hard labor, without benefit of probation, parole, or suspension of sentence for attempted first degree murder; and to fifteen years at hard labor, without benefit of probation, parole, or suspension of sentence for possession of a firearm by a convicted felon. The sentence for attempted first degree murder was ordered to run consecutively to the sentence for first degree murder, and the sentence for possession of a firearm was to run concurrently to the other two sentences.

A motion for new trial was filed on January 28, 2010, and denied on February 1, 2010. A motion for appeal was also filed on January 28, 2010, and was subsequently granted.

The Defendant now appeals and asserts three assignments of error. The Defendant contends the evidence presented is insufficient to prove beyond a reasonable doubt that he shot Kenderick Cyriak and his companion, the trial court erred in allowing shoe-print comparisons to be presented as scientific evidence in this case; and, the trial court erred when it allowed selective information on the phone records to be presented in the form of a chart or summary.

1

## FACTS

The Defendant was convicted of shooting Kendrick Cyriak and shooting and killing Telisha Rainey.

## ERROR PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

The trial court failed to impose a mandatory fine for the Defendant's conviction of possession of a firearm by a convicted felon. In addition to imprisonment, La.R.S. 14:95.1 requires the imposition of a fine of not less than one thousand dollars nor more than five thousand dollars. The trial court's failure to impose a mandatory fine renders the Defendant's sentence illegally lenient. However, because the issue was not raised, this court will not address it.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, the Defendant contends the evidence presented is insufficient to prove beyond a reasonable doubt that he shot drug dealer Kenderick Cyriak and his companion the night that he bought crack cocaine from Cyriak. The Defendant contends the sole evidence submitted by the State was the statement of a witness who suffered brain damage and memory loss in the shooting and there was no corroborating evidence except that Cyriak merely recalled him because he had sold him drugs. Further, Cyriak suffered from a scrambled memory, and there was no physical evidence, motive, or other testimony connecting him to the shootings.

> In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville,* 448 So.2d

2

676, 678 (La.1984). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; *see State v. Neal,* 2000-0674 p. 9 (La.6/29/01), 796 So.2d 649, 657, *cert. denied,* 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory requirement of La.R.S. 15:438 "works with the *Jackson* constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." *Neal,* 2000-0674 p. 9, 796 So.2d at 657.

*State v. Draughn*, 05-1825, p. 7 (La. 1/17/07), 950 So.2d 583, 592, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007). "When the key issue is not whether a crime occurred, but rather, the identity of the perpetrator, the state is required to negate any reasonable probability of misidentification. *State v. Hughes*, 05-992 (La.11/29/06), 943 So.2d 1047." *State v. George*, 09-143, p. 5 (La.App. 3 Cir. 10/7/09), 19 So.3d 614, 618.

Alex Granville was given immunity for his testimony. At the time of trial, he had pending drug charges. Additionally, he had prior convictions for simple robbery and drugs.

Granville testified that he was a drug addict and he went by the nicknames Saint, B.R., and Tank. He knew Kenderick Cyriak, whose nickname was Black. He also knew the Defendant, who was known as Jersey. Granville testified that the Defendant called him on December 26, 2008, asking for crack cocaine. Granville indicated he did not have any and told the Defendant he would call someone who could get it to him. Granville then called Cyriak, who agreed to sell drugs to the Defendant. Granville then gave the Defendant Cyriak's cell phone number.

Granville testified that he received a phone call from the Defendant on December 26 at 12:49 a.m. He then received phone calls from the Defendant at 2:08, 2:12, 2:13, 2:14, and 2:23 a.m.

3

Kenderick Cyriak testified that he had previously been convicted of aggravated battery, criminal damage, and "CDS 2." He admitted that he had been a drug dealer, and there were charges pending against him at the time of trial. Further, he had been granted immunity for his testimony.

Cyriak testified that he sold crack cocaine five to seven times a day. He had known Granville a month-and-a-half in December 2008, and sold drugs to him about twelve times during that period. On cross-examination, Cyriak indicated he had known Granville for three or four months.

Cyriak testified that he had known Telisha Rainey for approximately two to three months before her death. He was not romantically involved with her.

Cyriak testified that before noon on Christmas Day, he was home with his family. He went to the home of Rainey's sister around noon. He and Rainey subsequently left and eventually went to the Red River Inn. Cyriak had a room there because he and his cousin had been living together and were on bad terms.

Cyriak testified that he and Rainey watched television for approximately an hour-and-a-half. Cyriak then took Rainey to see her family in Lafayette. The two eventually returned to Alexandria and went to Roy's Barbeque Stand and hung out. While there, Granville called Cyriak and told Cyriak that he had a friend that needed fifty dollars worth of crack cocaine. Cyriak told Granville to give the friend his phone number.

The Defendant called Cyriak and said he needed fifty dollars worth of crack cocaine. Cyriak spoke to the Defendant two or three times. Cyriak then met the Defendant on Ninth Street. The Defendant entered the front seat of Cyriak's car, and the transaction took place.

4

Cyriak's cell phone records indicated that he received calls from the Defendant at 2:28 and 2:37 a.m. on December 26. Cyriak then called the Defendant at 2:41 and 2:42 a.m. Cyriak agreed that he sold crack cocaine to the Defendant between 2:42 and 2:45 a.m.

The Defendant called Cyriak again at 3:39 a.m. Cyriak testified that during that call, the Defendant asked for another fifty dollars of crack cocaine, which Cyriak had. The Defendant called again at 3:51, 3:56, and 3:57 a.m.

Cyriak testified that Rainey went with him to conduct the second transaction, as she wanted to go back to Roy's afterwards. Cyriak met the Defendant on Ninth Street, and the Defendant got into the back seat behind Cyriak. Cyriak testified that there was no one else with the Defendant. The Defendant told Cyriak to drive and turn at the corner. Once around the corner, the Defendant told him to pull over, which Cyriak did. Cyriak testified that as soon as he handed the Defendant the drugs, it felt like someone punched him in the back of the neck. Cyriak then tried to put the car in drive and leave, but everything was spinning around him. At that time, Cyriak did not hear any gunshots or know he had been shot. Someone then said, "get your bitchy ass out of the car." Cyriak was subsequently pulled out of the car and heard gunshots. Cyriak heard the tires of his car screech off, and he attempted to get up and walk. He then crawled to a house for help.

Cyriak had been shot three times. He never saw anyone approach the car. Further, he never saw Rainey get out of the car or be shot.

Cyriak agreed that the person who got into the backseat of his car was the same person that had previously gotten into the front seat of the car to buy drugs. Additionally, the voice he heard setting up the second transaction was the same voice he heard when setting up the first transaction. Cyriak identified the Defendant as the

5

person who entered his car just before he was shot. He also identified the Defendant in a photographic lineup.

Cyriak testified that the first time he spoke to police, he did not tell the truth. At that time, he told police he was not a drug dealer. Cyriak testified that he told police on December 26 that Rainey was in the car with him. However, he apparently said Trisha Moses was with him. He further told police his car was black when it was charcoal gray. Ten to fourteen days after the incident, Cyriak gave a second statement to police in which he admitted he was a drug dealer.

Cyriak admitted that in his second statement to police, he said "they" were shooting and "they" were pulling him out of the car. He then testified that because he had ringing in his ear, he thought there was a second person. Additionally, he thought he heard two voices.

Cyriak testified that he experienced memory problems at times. He further testified, "I might remember and forget, but it'll come back to me shortly." He was asked if anything ever came back to him that was not correct, and he responded, "Sometimes." He also admitted that his memories were "scrambled" sometimes. Cyriak was then questioned as follows:

> Q.    You kind of mistake things - - have you ever had anything happen that you thought happened, but your memory told you differently?
>
> A.    No, sir.

Cyriak testified that he actually lost his memory for three to four months after he was shot. He then testified that he could trust his memory and agreed that what he was saying at trial was an absolute fact.

Cyriak testified that on December 26, 2008, his girlfriend was Cornetta Grimes. The room that was rented at the Red River Inn was in Grimes' name. She was with him two days before he was shot. She then went to Oklahoma City.

6

Ashley Baggett was Cyriak's ex-girlfriend, and the two broke up approximately a year before the incident. He had spoken to Baggett on December 26, while he was in his motel room. Baggett said she was a couple of rooms down from him and wanted to fight Rainey over him.[1]

Sunshine Charrier testified that she was a patrol officer on December 26, 2008, but was no longer so employed. She responded to a call regarding a possible shooting and saw Cyriak sitting on a front porch. Charrier called for medical assistance. Cyriak said he thought he had been hit on the head, heard gunfire, and was then pushed out of the car. He was also concerned that the passenger was still inside the car. Charrier testified that Cyriak was in pain and seemed a little confused.

Detective Kline Johnson went to the Red River Inn on December 26, 2008. Detective Johnson then went to Green Oak and Seventh Street, the area where Cyriak's car was found. He took several photographs of the area, including one of a footprint leading away from the car.

Detective Johnson testified that on January 8, 2009, an arrest warrant was obtained for the Defendant and a search warrant issued for 730 Woodard Street. Detective Johnson assisted in the execution of the search warrant. Police found a bag of bullets and several loose bullets inside the home. At the time the Defendant was arrested, police took the pair of black New Balance 8025 tennis shoes he was wearing.

Detective Johnson testified that the footprint found by Cyriak's car was consistent with the ridge detail and defects found on the Defendant's left tennis shoe, and was of a similar size. Detective Johnson admitted that he did not perform any tests on the footprint and he did not know what type of shoe made the print.

_____

[1]Corporal Mark Tigner investigated Baggett's call to Cyriak.

However, he did examine the photograph he took of the footprint and the Defendant's left tennis shoe. Detective Johnson did not know how many pairs of the New Balance 8025 tennis shoes were made. However, he was sure it was more than one pair. Sergeant William Bates agreed that the number of that tennis shoe made was unknown. He also agreed that the pattern on the shoe was similar to that found in the photograph. However, he could not say the Defendant's shoe made the print.

Sergeant Bates was accepted as an expert in fingerprint identification and crime scene reconstruction. Sergeant Bates processed Cyriak's car for fingerprints. He found seven identifiable fingerprints on the car. He lifted identifiable fingerprints from the driver's side of the front windshield, the driver's side door, the trunk, the inside glass of the passenger side, and the outside door of the passenger side. Sergeant Bates testified that the prints belonged to the Defendant. Sergeant Bates's findings were confirmed by the North Louisiana Crime Lab. He had no idea when the fingerprints were left on the car.

Sergeant Bates charted phone calls that occurred between the Defendant, Cyriak, and Granville. He testified that the following calls occurred:

| Parties | Date | Time | Duration |
|---------|------|------|----------|
| -Defendant to Granville | 12/26/08 | 12:49 a.m. | 213 seconds |
| -Defendant to Granville | 12/26/08 | 2:08 a.m. | 124 seconds |
| -Defendant to Granville | 12/26/08 | 2:12 a.m. | 14 seconds |
| -Defendant to Granville | 12/26/08 | 2:13 a.m. | 62 seconds |
| - Defendant to Granville | 12/26/08 | 2:14 a.m. | 5 seconds |
| -Granville to Cyriak | 12/26/08 | 2:18 a.m. | 107 seconds |
| -Defendant to Granville | 12/26/08 | 2:23 a.m. | 246 seconds |
| -Defendant to Cyriak | 12/26/08 | 2:28 a.m. | 60 seconds |

| | | | |
|---|---|---|---|
| -Defendant to Cyriak | 12/26/08 | 2:37 a.m. | 35 seconds |
| -Cyriak to Defendant | 12/26/08 | 2:41 a.m. | 26 seconds |
| -Defendant to Cyriak | 12/26/08 | 2:42 a.m. | |
| -Defendant to Cyriak | 12/26/08 | 3:39 a.m. | 102 seconds |
| -Defendant to Cyriak | 12/26/08 | 3:51 a.m. | |
| -Defendant to Cyriak | 12/26/08 | 3:56 a.m. | |
| -Defendant to Cyriak | 12/26/08 | 3:57 a.m. | |
| -911 call regarding shooting | 12/26/08 | 4:09 a.m. | |
| -911 call regarding Rainey | 12/26/08 | 5:00 a.m. | |
| -Defendant to his mother | 12/26/08 | 5:32 a.m. | |
| -Defendant to his mother | 12/26/08 | 5:46 a.m. | |

The Defendant's mother called him back four times, with all calls between the two occurring in a little over an hour.

Corporal Mark Tigner spoke to Cyriak at the hospital the day he was shot. Cyriak was dizzy and complained that his head was hurting. Cyriak informed Corporal Tigner that he had given a ride to a man who had called him and was hit in the head. He further explained that after he was hit everything went dim, he was pushed out of his car, and his girlfriend, Tricia Moses,[2] was still inside the car.

Corporal Tigner put together a photographic lineup that was shown to Cyriak while he was in the hospital. The lineup included a photograph of the Defendant. Cyriak did not identify anyone in the lineup. After Cyriak was discharged from the hospital, he was shown a second photographic lineup, which contained a photograph of Granville. Cyriak did not identify anyone.

---

[2]Telisha Rainey was actually in the car with Cyriak.

9

Corporal Tigner subsequently learned that Granville was in a work release program, which is how he came to know the Defendant. Further, Granville was a drug user and had made purchases from Cyriak. Granville informed police that the Defendant called him several times trying to find drugs. Police learned that Granville had eaten Christmas dinner at the Defendant's residence. The next morning, the Defendant called Granville because he wanted to buy crack cocaine. Granville indicated that he did not have any but knew someone who did.

After speaking with Granville, Corporal Tigner confronted Cyriak. Cyriak was shown a photographic lineup containing the Defendant's picture. He identified the Defendant as the person he met up with or sold drugs to. As a result, police obtained an arrest warrant for the Defendant.

Corporal Tigner testified that the Defendant had previously been convicted of simple robbery and false representation of cocaine.

Shontrice Jackson testified Defendant was the father of her child. Additionally, the two were living together in December 2008. She recalled the Defendant being at home that day. She went to bed between 5:00 and 6:00 p.m. However, she told police she went to bed at approximately 8:00 p.m. At 2:30 or 3:00 a.m., she woke up and realized the Defendant was not at home. Jackson did not go look for the Defendant at that time. Jackson testified that the Defendant was home when she woke up later that morning.

Police executed a search warrant at the residence and found a bag containing bullets. Jackson testified that the bullets had been in the house for a while. However, the .22 her father had previously given her was not in her house in December 2008, as she had returned it to him.

Jackson reviewed the Defendant's cell phone records . The records indicated the Defendant called her at 8:27, 8:31, 8:40, and 8:48 a.m. and 6:26 and 7:56 p.m. on December 25. Jackson called the Defendant at 4:15 a.m. on December 26.

Dr. Lawrence Drerup was accepted as an expert in neurosurgery. Dr. Drerup testified that Rainey was dead when emergency medical services arrived at the location where she was found. Rainey was brought to the hospital at 5:24 a.m. with a gunshot wound to the head. Dr. Drerup performed surgery on Rainey. However, he was unable to remove the bullet from Rainey's brain. Rainey was pronounced dead on December 27, 2008, at 2:40 p.m.

Cyriak arrived at the hospital at 6:49 a.m. He had two gunshot wounds to the head and one to the neck. It was unlikely that Cyriak would have survived without surgical intervention. Dr. Drerup testified that the shot to the mastoid area probably dazed or knocked Cyriak out and would be consistent with Cyriak's testimony that it felt like someone punched him. Dr. Drerup further testified that Cyriak should have suffered confusion from any one of the gunshot wounds, which would have gotten better in one to three days. Dr. Drerup testified that Cyriak might not remember all the details of the incident, but any confusion about what he did two days before the injuries or two months after the injuries should not occur.

Dr. Collie Trant, an expert in forensic pathology, performed an autopsy on Rainey. Rainey suffered a single gunshot wound to the head. The bullet entered above the left ear. The manner of death was homicide.

Mike Stelly was accepted as an expert in firearms and fingerprint identification. Stelly was unable to determine if Cyriak and Rainey were shot with the same weapon. However, the bullets recovered from Cyriak and Rainey were .22 caliber. The recovered bullets and fragments all had a gold or brass colored wash on them.

Furthermore, seventeen of the nineteen .22 caliber bullets found at the Defendant's residence had a gold wash.

In brief to this court, the Defendant notes that Cyriak had problems with his memory and did not see who shot him. However, he recalled the Defendant being the person in the backseat behind him before he was shot. The Defendant further notes that Cyriak said he heard two voices before he was pulled out of his car, but, at trial, claimed to have heard only one voice, which he identified as that of the Defendant.

The Defendant contends there is nothing to rule out the possibility that after the sale of drugs to him, he got out of Cyriak's car, another customer approached the car, shot Cyriak, and drove off. The Defendant further contends that Cyriak's physical injuries and the resulting mental confusion render his uncorroborated testimony insufficient as a matter of law.

The Defendant contends there was no relationship between the bullets found at his residence and the projectiles recovered from the victims. He further contends that testimony regarding consistent shoe patterns did not include any suggestion that his shoes were uncommon or exclude the possibility that another person with that kind of shoes was the perpetrator.

The State asserts the evidence is sufficient to support the Defendant's convictions, as Cyriak identified the Defendant as the only person in the back seat of his car when he was shot three times in the back of the head. Further, the cell phone records of the Defendant, Cyriak, and Granville supported the contacts and time line established by Cyriak and Granville.

The State additionally asserts the Defendant was not at home during the time of the drug deals and the homicides. Further, Cyriak's car was abandoned within

12

walking distance of the Defendant's home, and the Defendant's fingerprints were found on the car.

The State further asserts the shoes the Defendant wore during his arrest were similar to shoes which left impressions at the place Cyriak's car was abandoned. Additionally, ammunition similar to that found at the Defendant's residence was recovered from the victims.

It is clear that after hearing testimony regarding Cyriak's injuries and his memory loss, the jury chose to believe Cyriak's testimony that the Defendant was sitting in the backseat of his car behind him when he felt like he had been punched in the neck, and, that he was dragged from the car and the Defendant drove away with Rainey in the car. We note that Dr. Drurep testified that being shot in the back of the head either dazed or knocked Cyriak out and that testimony was consistent with Cyriak's testimony that it felt like someone punched him. Further, the Defendant was not inside his residence at the time of the offenses, the Defendant spoke to Cyriak by phone just prior to the offenses, the Defendant's fingerprints were found on the Defendant's car, shoe prints similar to those worn by the Defendant when he was arrested were found near Cyriak's car, and .22 bullets similar to those recovered from Cyriak and Rainey were found at the Defendant's home.

We find that the jury made a credibility determination in this matter and that determination should not be second guessed by this court. Accordingly, this assignment of error lacks merit.

### ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, the Defendant contends the trial court erred in allowing shoe print comparisons to be presented as scientific evidence because it failed to act as gatekeeper before deciding whether the witness had the foundation

13

required for providing an opinion on the matter. The Defendant also contends that Detective Kline Johnson was not qualified as an expert in shoe print identification or any other field. Thus, the trial court erred in allowing his testimony regarding the similarities between the Defendant's shoes and the print found near the Defendant's car. The Defendant further contends the method used by Detective Johnson was unscientific, unreliable, subjective, and had no indicia of reliability as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993).

At trial, Detective Johnson was questioned on direct examination about a comparison of a shoe print found by Cyriak's car and the shoes the Defendant wore at the time of his arrest. Defense counsel objected to such testimony, asserting Detective Johnson had not been qualified as an expert.

In brief to this court, the Defendant asserts that Detective Johnson's opinions and conclusions were reached by a comparison of the shoes with a photograph of the shoe print. He contends no scientific testing was done to determine if his shoes made the print. Further, Detective Johnson admitted he did not know if the Defendant's shoe made the print, but led the jury to believe the shoe made the print, and he did not know the exact size of the shoe.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." La.Code Evid. art. 702.

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
>
> (1) Rationally based on the perception of the witness; and
>
> (2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

La.Code Evid. art. 701.

In *State v. McGuire*, 560 So.2d 545 (La.App. 1 Cir.), *writ denied*, 565 So.2d 941 (La.1990), the defendant complained the trial court erred in allowing Sheriff Larpenter to give opinion testimony that the shoe prints found near the burglarized home matched perfectly with the shoes the defendant was wearing at the scene of the crime. The defendant asserted that Sheriff Larpenter was not qualified as an expert and that his testimony should have been excluded.

Sheriff Larpenter testified that he observed two sets of footprints. One appeared to be from a tennis shoe and the other a tennis shoe with plastic cleats. When the State attempted to show Sheriff Larpenter the shoes, defense counsel objected, asserting the State was going to attempt to have Sheriff Larpenter make an identification or a link between a print found at the scene and the shoe. Defense counsel asserted the best evidence would have been a cast of the print and not Sheriff Larpenter's testimony about what he saw. Additionally, Sheriff Larpenter could not be qualified in an area, such as an expert in forensics, that would allow him to testify that the print he saw matched the shoe positively. The trial court overruled the objection, finding it was common knowledge.

On appeal, the first circuit noted:

> The general rule that a witness can testify only as to the facts within his knowledge and may not testify as to any impressions or opinions that he may have is set forth in La. R.S. 15:463.[4] However, it has been determined that, where the subject of the testimony is such that any person of experience may make a natural inference from observed facts, a lay witness may testify as to such inference provided he also states the observed facts. *State v. Moten,* 510 So.2d 55 (La.App. 1st Cir.), *writ denied,* 514 So.2d 126 (La.1987).

_____

[4]La.R.S. 15:463 states:

Except as otherwise provided in this Code, the witness can testify only as to facts within his knowledge, and neither as to any recital of facts heard by him, nor as to any impression or opinion that he may have.

La.R.S. 15:463 has also been repealed by Acts 1988, No. 515, § 8.

*Id*. at 550-51.

The first circuit then held that Sheriff Larpenter's observations provided an adequate factual basis for his inference that the defendant's tennis shoe matched the shoe prints found near the burglarized home.

Based on the ruling in *McGuire*, we find Detective Kline need not be qualified as an expert to give testimony comparing the shoe print found by Cyriak's vehicle to the Defendant's shoes. Furthermore, Sergeant Bates testified regarding a comparison of the shoe print and the Defendant's shoes and the Defendant did not object to that testimony.

In brief to this court, the Defendant also asserts the method used by Detective Kline was unscientific, unreliable, subjective, and had no indicia of reliability as required by *Daubert*, 509 U.S. 579. Defense counsel did not object on this basis at trial and may not raise this issue for the first time on appeal. La.Code Crim.P. art. 841; *State v. Vidrine*, 08-1059. (La.App. 3 Cir. 4/29/09), 9 So.3d 1095, *writ denied*, 09-1179 (La. 2/26/10), 28 So.3d 268.

For the reasons asserted herein, we find this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER THREE**

In his third assignment of error, the Defendant contends the trial court erred when it allowed selective information on the phone records presented in the form of a chart or summary. The Defendant contends the exhibit was misleading because it left out exculpatory evidence and the manner in which it was compiled sought to suggest that some evidence was more important than other evidence. Further, it did not assist the jury, confused the issues, and was unfairly prejudicial.

Sergeant Bates and Detective Tigner compiled a summary of telephone calls between the Defendant, Granville, and Cyriak. The summary also included two 911 calls and several calls between the Defendant and his mother that occurred after the 911 calls were made.

Defense counsel objected to State's exhibit seventy stating the following:

> I'm going to object as to the foundation and that it is not actual evidence. It's been - - it's part of the evidence that's already in. The phone records are already in. This is just a part that's been manipulated to . . . show whatever it is he's trying to show, and it should be used for illustrative purposes only. It should not be allowed into evidence, because as I know it, those records that were sent from the cell phone company never had any red, blue, yellow color-coding on it.

The trial court overruled the objection.

The Defendant asserts the phone records presented by the State were nothing more than e-mailed documents from the phone company with no authentication by the phone company of those business records.

The Defendant asserts the summary of phone calls, State's exhibit seventy, was created by Sergeant Bates and Detective Tigner, but it was not a summary. The Defendant asserts it was their interpretation of a few phone calls believed to be important and pulled from many pages of phone records. The Defendant contends this approach was misleading to the jury and deprived it of its ability to require the State to meet its burden of proof. The Defendant further asserts the summary omitted the call from Ashley Baggett because her phone number was not on the records of Cyriak, Granville, and the Defendant.

The Defendant contends that while the summary may have been permissibly used as demonstrative evidence, it was improperly admitted as substantive evidence, as it misled the jury and its prejudicial effect far outweighed its probative value. The

Defendant further contends the trial court erred in denying his request for a jury instruction explaining that the summary was only an exhibit.

The Defendant asserts that La.Code Evid. art. 1006 specifically addresses the admissibility of summaries. Article 1006 states:

> The contents of otherwise admissible voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

The State asserts the summary was necessary to prevent confusion. It contends that defense counsel remarked there were too many records to keep straight and he was confused by the volume of records. Furthermore, the original records were admitted to support the summary.

The State further notes that the Defendant appears to complain that his phone records were not authenticated. However, the phone records of Cyriak and Granville were admitted without objection and contained the calls made to them by the Defendant.

Defendant's cell phone records were admitted without objection. The Defendant objected to the introduction of Granville's cell phone records for lack of a proper foundation, stating that Granville identified some of the calls that he may or may not have made. The Defendant objected to the introduction of Cyriak's cell phone records for lack of foundation, as they had never been identified as an official print by someone from Virgin Mobile. That objection was sustained. The Defendant subsequently renewed his objection, which was overruled. The Defendant indicated the introduction of a supplemental response to a subpoena for the Defendant's cell phone records was repetitive. However, he did not object to its admission.

18

We note the Defendant did not object to the admission of his cell phone records or those of Granville on the basis that they were not authenticated. He did object to Cyriak's cell phone records on that basis. However, the calls from Cyriak to the Defendant and Granville could be found on the phone records of the Defendant and Granville.

In *United States v. Petty*, 132 F.3d 373 (7 Cir. 1997), the prosecution offered charts into evidence under Fed. R. Evid. 1006 as summary evidence. The district court declined to allow the evidence. However, it did allow the witness to testify about the charts and to use them as demonstrative aids. On appeal, the defendant argued that the witness's testimony was improper because she merely vouched for the government's case, usurping the role of the fact finder. The Seventh Circuit discussed the issue as follows:

> Although the district court did not admit Rachow's charts into evidence, under Rule 1006 it was within the district court's discretion to do so. Rule 1006 provides that, "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Fed.R.Evid. 1006. The charts fit squarely within the Rule. *See United States v. Conley*, 826 F.2d 551, 559-60 (7th Cir.1987) (Court below properly admitted summaries showing defendant's tax liability.); *Bentley,* 825 F.2d at 1108 (Court below properly admitted charts summarizing defendant's net position in silver and copper futures.). They summarized telephone records already in evidence-records which were quite unwieldy and more complex than a consumer's monthly telephone statement. The district court noted that the charts accurately represented materials already in evidence, but for reasons unapparent to us the district court declined to accept the summaries into evidence.

> The court's decision does not trouble us, however. The court exercised its discretion under Rule 611(a) to control the "mode and order" of presenting evidence, here requiring the Government to present its evidence orally rather than in written form. The practical effect of the court's decision is that no papers followed the jury into their deliberations. Arguably this is helpful to a defendant. Sending the Government's paper evidence into the jury room can reinforce its harmful effect on the defendant's case, while admitting only testimony forces the jury to recall the evidence on its own.

19

*Id*. at 379.

In *United States v. Dorta*, 783 F.2d 1179 (4th Cir. 1986), *cert. denied, Drum v. United States*, 477 U.S. 905, 106 S.Ct. 3274 (1986), the defendants were convicted of numerous drug-related offenses. On appeal, the defendants asserted the trial court erred in allowing two government charts into evidence that they alleged inaccurately and unfairly summarized telephone toll records. The Fourth Circuit noted the lengthy telephone records had already been introduced into evidence, and the charts summarized the calls that were relevant to the government's case. The court, citing Fed. R. Evid. 1006, found that because the charts were accurate summarizations of evidence already before the jury, there was no error in the district court's exercise of discretion in admitting the charts into evidence.

The summary at issue in the case at bar listed those calls relevant to the State's case. That information could be found in phone records admitted into evidence at trial. Based on the cases cited herein, we find that State's exhibit seventy was properly admitted at trial.

Defense counsel requested that the trial court instruct the jury that State's exhibit seventy was merely an exhibit. Defense counsel then stated the following: "And I understand that it's evidence because you let it in as evidence, but it's for exhibition purposes only, because it is not exactly the same as the original cell phone records. In fact some of the wording is different from the original cell phone records." The trial court denied the request and informed defense counsel that he could address the issue in his closing argument. Defense counsel stated he understood. The trial court then stated: "Your objection is noted for the record."

> Under La.Code Crim. Proc. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. The special charge need not be given if it is adequately covered by the

general charge or in another special charge to be given. *State v. Segers,* 355 So.2d 238, 244 (La.1978), *rehearing granted on other grounds,* 357 So.2d 1 (La.1978). Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. *State v. Marse,* 365 So.2d 1319, 1323 (La.1978); *see also* La.Code Crim. Proc. art. 921. As we noted above, the "great caution" language is necessary only when the State's case rests on accomplice testimony alone. When the accomplice testimony is corroborated by other evidence, such language is not required. *State v. Washington,* 407 So.2d 1138, 1147 (La.1981); *State v. Murray,* 375 So.2d 80, 88 (La.1979).

*State v. Tate,* 01-1658, pp. 20-21 (La. 5/20/03), 851 So. 2d 921, 937, *cert. denied,* 541 U.S. 905, 124 S.Ct. 1604 (2004).

The Defendant has not argued that his rights were substantially violated by the omission of the proposed jury instruction or that he was prejudiced by the trial court's failure to give the requested instruction. Thus, the Defendant's argument that the trial court erred in omitting the proposed jury instruction is without merit. *See State v. Spears,* 39,302, (La.App. 2 Cir. 9/27/06), 940 So.2d 135, *writ denied,* 06-2704 (La. 8/31/07), 962 So.2d 424, *cert. denied,* 552 U.S. 1312, 128 S.Ct. 1888 (2008).

For the reasons asserted herein, this assignment of error lacks merit.

## CONCLUSION

The Defendant's convictions for first degree murder and attempted first degree murder are affirmed.

**AFFIRMED.**